OPINION OF THE COURT
Jeffrey G. Stark, J.
In these two actions, joined for trial, the plaintiff, Kathleen Di Lullo Engrassia, and her attorney, Lee M. Albin, seek to set aside two mortgages on the jointly owned marital home given by her former husband, Frank Di Lullo, one to his mother, Anna ($8,000), and another to his brother, Carmine ($7,000).
For the reasons which follow, the court finds that at the time Frank gave an $8,000 mortgage to Anna to secure antecedent debts, he was in fact only indebted to her in the sum of $3,687.19. Of this $3,500 was thereafter repaid, leaving an obligation of $187.19. Because Kathleen did not prove that Frank was insolvent at the time of this mortgage (such proof being that Frank’s arrears for child sup *668 port then owing plus his “probable” future support obligations exceeded his assets), the mortgage will not be set aside as constructively fraudulent within the holding of Spear v Spear (101 Misc 2d 341), but will instead be reduced to $187.19. The court further finds that at the time Frank gave a further $7,000 mortgage to Carmine, Frank knew (and Carmine should have known) that it would effectively prevent Kathleen from collecting $12,772 in judgments and arrears then owing and future support obligations as they became due. Nevertheless, although Frank was insolvent at the time of this mortgage, because it was not given for an antecedent debt (as was the transfer in Spear v Spear, supra) but instead for a present advance of $7,000, the court finds the transfer was made in good faith and was not, therefore, constructively fraudulent. Consequently, judgment is granted dismissing the complaint against Carmine and in favor of the complaint against Anna but only to the extent of ordering her to file a satisfaction of her mortgage for the difference between $8,000 and $187.19.
BACKGROUND FACTS
Kathleen and Frank signed a separation agreement in September, 1977, which provided that it would not be merged in any subsequent decree. Pursuant to the agreement, Frank was responsible to pay $200 per week as child support until the remarriage of Kathleen, and $66 per week per child in the event of Kathleen’s remarriage. In June, 1978, the parties were divorced.
The separation of Kathleen and Frank resulted in an extraordinary series of legal confrontations (of which four separate actions are presently before the court). Indeed, in an order dated November 20,1980, Justice Di Paola noted that since March, 1978 “no less than fourteen (14) Justices of this Court have been called upon to render decisions * * * for these parties.” The legal history which is pertinent to the present action is this:
Kathleen remarried on March 9, 1979. Thereupon, Frank stopped monthly support payments for his son, Frank, Jr. In December, 1979, Kathleen instituted an action to collect those arrears and on January 17, 1980 obtained a judgment in the sum of $2,572 representing *669 child support arrears from March 9, 1979 to November 16, 1979 plus $150 in attorney’s fees.
In late November, 1979, a trial was held before Justice Roncallo on Frank’s application to obtain custody of all the infant children of the marriage. As a consequence of that trial, an order was entered on February 15, 1980 awarding Kathleen $3,918.50 for attorney’s fees and disbursements.
In 1980, Kathleen moved to modify the divorce decree to conform to the provisions of the separation agreement with respect to support. Frank cross-moved for modification and a credit on account of Frank, Jr., who had been residing with him since November, 1977. In a memorandum decision dated November 20, 1980, Justice Di Paola granted the motion, denied Frank’s cross motion for a downward modification, but granted the cross motion to the extent of ordering a “credit” in the sum of $66 a week from the date of plaintiff’s remarriage, March 9, 1979. The concluding paragraph of said memorandum reads: “As indicated heretofore, no less than 14 prior proceedings have been inflicted upon this Court and a careful examination reveals that while the plaintiff has been successful in most of these proceedings, she has not been able to achieve the full financial result intended by the Court due to one reason or another. Considering and evaluating the legal services that were necessary for the plaintiff to pursue this modification proceeding and also to defend against the defendant’s claims, as well as the ability to pay (cf. Childs v. Childs, 69 AD2d 406), this Court will award to plaintiff as counsel fees the sum of $3,500.00, plus disbursements of $244.00, payable within 60 days from service of a copy of the order to be entered herein.” Thereafter, an order was granted on February 24, 1981 ordering Frank to pay Lee M. Albin, Kathleen’s attorney, the sum of $3,500 attorney’s fees and $244 disbursements.
On January 20, 1982, Justice Morrison was presented with an application by Kathleen for an order punishing defendant for civil contempt for his continued failure to pay child support. In granting the motion, Judge Morrison stated: “The defendant’s payment record is, in a word, dismal. The defendant’s affidavit in opposition does not *670 contradict plaintiff’s assertion that over $10,000.00 in arrearages have accrued. One Justice has characterized defendant’s conduct as an ‘apparent complete disregard of Court orders requiring support payments’ (Engrassia v. Di Lullo, Sup. Ct., Nassau County, Velsor, J. 9-25-81). Numerous judgments have been obtained against the defendant for arrears but all remain unsatisfied. The defendant has so distributed his assets as to render him ‘judgment proof.’ A wage deduction order under Personal Property Law §49-b did not result in any recovery.” After a number of legal proceedings by Frank to overturn this order, he was remanded to the Nassau County Jail where he remained for six months.
From November, 1979, to on or about November, 1980, Frank paid no support at all. After Justice Di Paola’s decision in November, 1980 which, in effect, reduced Frank’s support obligation from $200 to $134 per week, Frank paid $20 a week for the next year, until November, 1981, at which time Frank stopped all payments for the following 40 weeks. On July 14, 1982 a judgment was entered in favor of Kathleen in the sum of $12,803 representing $12,598 arrears and $205 costs. The arrears were figured on a total of $15,840 owing in the period November 30, 1979 through March 12, 1982, from which was deducted $800 actually paid in that period and $2,442 representing Justice Di Paola’s retroactive credit.
Against this background of Frank Di Lullo’s continuing default in his support obligations, the court must determine whether to set aside two mortgages on the marital home given to Frank’s mother and brother. A trial was held on July 11 through 14 at which the following testimony was adduced:
THE TRIAL TESTIMONY
In 1970, Kathleen and Frank purchased the premises in issue for $28,500. At the time of trial, both parties agreed the house was worth approximately $60,000 and had a first mortgage which had been reduced to less than $15,000, leaving an equity of approximately $45,000.
On January 9, 1980, Frank owed Kathleen approximately $3,360.[1] At that time, he testified, his only asset, *671 other than a “rinky dink coffee truck” worth approximately $800, was his half interest in the marital home, that interest then being worth approximately $22,000.
Frank had been in the coffee route business since 1966. In January, 1980, he worked for a company, Plain & Fancy, which paid him a net salary of approximately $225 per week. Taking Frank’s support obligations into account, this salary left Frank at most $91 a week, which was insufficient to cover Frank’s basic needs. To make ends meet, Frank had to borrow substantial moneys from his mother, brother and employer.
On January 9,1980, Frank executed a mortgage in favor of his mother, Anna Di Lullo, to secure payment of an indebtedness in the sum of $8,000.[2] At the time, Anna testified, she knew Frank was in arrears in his support payments.
The circumstances giving rise to the execution of this mortgage are at best unclear. Frank testified that he and his mother understood the custody proceeding before Justice Roncallo in November, 1979 to include an application by him to force the sale of the marital home. (In fact, it did not and could not since the nonmerged separation agreement gave Kathleen exclusive occupancy until her youngest child was 18 years of age.) He further testified that upon the conclusion of that hearing his mother, who had previously loaned him substantial sums, was shocked to learn she would not be. recovering her loans out of the sale of the house. Frank testified his attorney then suggested Frank mortgage his interest in the house to his mother.
When she testified, Anna Di Lullo could recall no promises that the house would be sold after the hearing before Justice Roncallo. Rather, she testified that during a meeting with Frank’s attorney after Frank lost the custody suit she raised the question of how she could protect the money she was owed, at which point the mortgage was recommended. Anna further testified that when she received the mortgage she had no intention of obtaining any *672 priority over Kathleen; her only concern was that Frank might die or become a ward of the State.
With respect to the sums actually loaned by Anna to Frank, the testimony was also unclear. Frank was apparently quite close to his mother and went to live with her after his separation from Kathleen. Anna was an independent woman, having inherited a substantial sum of money from her late husband (the precise amount of which was unknown to Frank). A portion of the inheritance was kept in a safe at home. Anna maintained written accounts of the moneys she loaned to Frank (Frank did not) and was fully familiar with the terms of his separation agreement from Kathleen. Anna was apparently intimately acquainted with Frank’s financial situation and was called upon to pay a number of his obligations including car payments, attorney’s fees, mortgage payments, doctors’ bills, even support payments.
After Frank’s separation, Anna obtained a spiral notebook in which she kept records of sums loaned to Frank and any sums repaid by him. This notebook, she testified, was kept in her safe. Frank also testified that the importance of record keeping was emphasized by his attorney prior to the preparation of the $8,000 mortgage when he advised that Anna might some day be called upon to produce canceled checks and proof of cash loans to support her mortgage. Nevertheless, at trial Anna was unable to produce the notebook which both she and Frank testified was the source of the $8,000 figure set forth in the mortgage.
Anna did not have a convincing explanation for her loss of the notebook; to the contrary, she substantially altered her testimony to state that the notebook was not, in fact, kept in the safe but kept in a nonlocked “vault” next to the safe which, she said, she had erroneously referred to as the safe. Because this testimony was not convincing, and because the notebook was clearly the best evidence of the loans made to Frank, or on his behalf, prior to January 9, 1980, the court has credited Anna’s testimony as to such loans only where supported by clear documentation, in this case canceled checks. These checks show that prior to *673 January 9, 1980 Frank was indebted to Anna for the following sums:
$ 283.00
1,000.00
56.92
556.92
142.23
58.53
121.25
214.06
184.28
570.00
500.00
$3,687.19
(John Mazzillo, Inc.)
(Jack Stern)
(Greenpoint Savings Bank)
(Greenpoint Savings Bank)
(Blue Cross)
(Prudential)
(Prudential)
(Equitable Life)
(Lilco)
(Greenpoint Savings Bank)
(Center For Law & Social Work)
In addition to the above, Anna proved five payments, each in the sum of $135, to the European American Bank on account of Frank’s car loan. But Frank thereafter gave the car to Anna because he was unable to make the payments. Frank apparently made 12 payments himself and Anna the remaining 24. Anna’s total payments were therefore approximately $4,240. But Anna thereafter sold the car for approximately $4,700; consequently, she made a small profit on this transaction.
As noted above, Anna satisfactorily proved only $3,687 in loans to Frank prior to her receipt of the $8,000 mortgage on January 9, 1980. Moreover, this sum was almost entirely repaid the following October when Frank borrowed $7,000 from his brother Carmine of which $3,500 was remitted to Anna. Anna testified that this $3,500 was intended to repay loans made after the mortgage but she was unable to document such loans. More importantly, there was no objective basis for her to apply the $3,500 to postmortgage loans rather than to extinguish the debt of the mortgage. Consequently, the court finds that the mortgage was in fact satisfied in October, 1980, except for $187.19.
Carmine Di Lullo’s testimony was straightforward and credible. He testified that in October, 1980, his brother Frank asked him for a substantial loan. At the time, Carmine knew Frank owed Anna a substantial sum and *674 that Anna was very upset about it. Carmine also knew that Frank was struggling to make ends meet and was in arrears in his support payments to Kathleen, although Carmine did not know, or inquire, as to the amount of those arrears.[3] Carmine did know, however, that Frank had been in court “every couple of months” with Kathleen, that he had been ordered to pay counsel fees in the proceeding before Justice Roncallo, and that his support obligation was $200 a week.
When Frank came to Carmine in October, Carmine was earning approximately $45,000 a year and was supporting a wife and four children, ages 7 through 19. Carmine and his wife had been saving to put their children through college and decided they could not give Frank a loan unless it was secured. Carmine believed Frank had only one asset, his interest in the former marital home, and asked Frank to give a mortgage on that interest; Frank did so. The same date, October 25, 1980, Carmine issued three checks on behalf of Frank totaling $7,000, one to Frank himself, one to Frank’s attorney, and one to Frank’s employer to whom Frank was also indebted.
DISCUSSION
In support of her action to set aside Anna’s and Carmine’s mortgages, plaintiff relies on Spear v Spear (101 Misc 2d 341, supra), which in turn relied upon Southern Inds. v Jeremías (66 AD2d 178). In Jeremías, an insolvent corporation owed its director and major stockholder, Jeremías, $200,000. It also had other creditors, including Southern Industries, Inc. Southern Industries was owed approximately $31,000. In August, 1976, the corporation decided to sell off its tangible assets in order to satisfy its creditors to the extent possible. Thereafter, Jeremías purchased all those assets in consideration of the cancellation of his debt. Southern Industries thereafter reduced its debt to a judgment and then sought to set aside the sale to Jeremías.
*675 The Second Department held in favor of Southern Industries even though it found no actual fraud. The court recognized that the sale to Jeremías was for “fair consideration” within the meaning of the constructive fraud provision of section 273 of the Debtor and Creditor Law because it was for the satisfaction of an antecedent debt. Nevertheless, because “fair consideration” also required proof of “good faith” (Debtor and Creditor Law, § 272, subd a) and because historically the law forbade the granting of a preference by an insolvent corporation to its officers, directors or stockholders, the court found that “good faith” was absent from the transaction and it set aside the sale.
Spear v Spear (supra) was an action with many of the markings of the case at bar. There, a former husband was in default of his obligations for child support and alimony. He was also in debt to his girlfriend, who had loaned him $13,650. As here, the husband’s sole asset was his equity in the former marital premises, which equity was then valued at $20,000. As here, the husband attempted to prefer other than his former spouse. In Spear, he did so by confessing a judgment on March 23, 1976 to his girlfriend in the sum of $13,500. This judgment was antedated by a judgment in the sum of $7,858 in favor of the ex-wife and was postdated by two judgments in favor of the ex-wife exceeding $10,000.
In Spear (supra) Mr. Justice Spatt found that the debt of the girlfriend was bona fide. It followed from this that the confession of judgment was for an “antecedent debt” and that, therefore, no actual fraud was shown. However, citing Jeremías (supra), Justice Spatt found that the confession of judgment rendered the husband insolvent (Debtor and Creditor Law, § 273) and that it lacked “good faith” (Debtor and Creditor Law, § 272, subd a). He therefore ordered the judgment canceled of record. In finding lack of good faith, Justice Spatt stated (101 Misc 2d 341, 348-349): “Measured by the standards and factors above set forth, this judgment of March 9, 1977 must be deemed void for lack of good faith because it was consummated with the intent to, or knowledge of the fact that, said judgment would hinder and delay Sandra [the wife], a bona fide creditor, with regard to the arrears due her by Roy which *676 were not yet protected by a judgment. It is clear that Roy and Donna [the girlfriend] did not act in good faith to this known creditor. They did not act in good faith to his children and their mother who were owed a duty of support by Roy, which he had ignored, to the knowledge of Donna. Instead, they jointly acted to quickly create this judgment which, although based on fair consideration, was deliberately executed to protect Donna and, therefore, hurt Sandra. They knew, when they arranged this judgment, that it would not only hinder and delay Sandra but, in effect, would wipe out the arrears due her which were not yet protected by a judgment. Roy’s equity in the building would be extinguished by Donna’s judgment, leaving Sandra permanently hindered and irrevocably delayed. This was a lack of good faith. This was a failure to deal honestly, fairly and openly with the mother of his children, all of whom he neglected to support.”
Although there are many similarities between Jeremías (supra) and Spear (supra) on the one hand, and the present case on the other, the differences are telling. In the two cited cases, the transfer rendered the debtor insolvent. Indeed, it left the debtor with no assets at all. In this regard, it is to be noted that in Spear (supra, p 348) Justice Spatt found that the confession of judgment “would wipe out the arrears due [the plaintiff] which were not yet protected by a judgment.” The same cannot be stated here. In the present case, at the time of Carmine’s mortgage, October 25, 1980, Frank’s equity in the former marital premises was approximately $20,000. At that time, as found by the court, Frank’s debts to Anna and Carmine were only $7,187. Since Kathleen was only owed $12,772 as of October 25, it appears that Frank’s equity in the former marital premises ($20,000 +) exceeded on that date the sum of his debts to Kathleen, Anna and Carmine ($19,959). Thus, considered alone, it is questionable whether the mortgages at issue rendered Frank insolvent (insolvency being the sine qua non for setting the mortgages aside as fraudulent [Debtor and Creditor Law, § 273]).[4]
*677 Notwithstanding, subdivision 1 of section 271 of the Debtor and Creditor Law defines insolvency as “A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.” In Marine Midland Bank v Stein (105 Misc 2d 768 [Kassal, J.]) the court set aside a gift of property by a guarantor of a loan, prior to a default on the loan, on the ground there was a “probable” (although not absolute) liability for the loan at the time of transfer which exceeded the guarantor’s assets. (Accord Enthoven v Enthoven, 167 Misc 686, affd 256 App Div 813; see, also, Amadon v Amadon, 359 Pa 434.) It thus can be argued that Frank’s “probable” liability for support in January of 1980, when he gave a mortgage to Anna, exceeded his then arrears, particularly in light of Frank’s consistent failure to pay child support. Since Frank’s “good faith,” as well as that of his mortgagee, is at issue in assessing the propriety of the transfer (Studley v Lefrak, 66 AD2d 208), it could thus be argued that Frank, and probably Anna, intended that the mortgage to Anna would hinder, if not prevent, Kathleen from collecting arrears then due and growing daily, and hence was not made in good faith.
Although these arguments, if supported by the facts, would warrant an extension of Spear to cover alimony obligations which had not yet become arrears, nevertheless those facts are wanting with respect to Anna’s mortgage. Kathleen had the burden of proving that, at the time of the mortgage to Anna, Frank’s “probable” debts exceeded his assets of $20,000 less the mortgage of $8,000.[5] (Commercial Trading Co. v Potter Securities Corp., 26 AD2d 761.) Since Frank’s arrears on January 9, 1980 were only $3,360, that conclusion is not warranted. Consequently, the balance found due on Anna’s mortgage, $187.19, remains viable.
Of course, a very different situation was presented in October, 1980, when Carmine received his mortgage. At that time, Kathleen was owed $12,772 in judgments and arrears, and Frank had paid no child support since at least *678 November, 1979. Thus, when Frank gave a $7,000 mortgage to Carmine, on top of the mortgage already given to his mother, it is highly probable Frank knew (and Carmine should have known) it would prevent Kathleen from enforcing her support rights.
But the analysis does not end here. For what distinguishes Carmine from his mother and from the transferees in Spear (101 Misc 2d 341, supra) and Jeremias (66 AD2d 178, supra) is that the transfer to him was not for an antecedent debt but for the loan of $7,000 fresh money. Here, then, unlike in Spear and Jeremías, the predominant purpose of the transaction was not to obtain a preference. Rather, Carmine testified, and the court has found, that he would not have made a loan to Frank unless he received the security of a mortgage. In demanding the mortgage Carmine was not attempting “to obtain an unconscionable advantage” (Southern Inds. v Jeremias, supra, p 183); to the contrary, as would any other reasonable creditor dealing with an impecunious debtor, he was simply seeking to “secure a present advance”. (Debtor and Creditor Law, § 272, subd b.) Since Carmine was acting in good faith in demanding a mortgage, and since the mortgage was in the amount of the moneys actually loaned by him, the mortgage was received for “fair consideration” (Debtor and Creditor Law, § 272, subd b). Consequently, there is, under these facts, neither a constructive fraud (§ 273) nor actual fraud (§ 276). The mortgage to Carmine cannot, therefore, be set aside. (See, generally, 24 NY Jur, Fraudulent Conveyances, § 20, p 418 [fact that transferor insolvent “does not make the conveyance fraudulent where there has been payment of a fair consideration.”])
COUNTERCLAIM
In his answer to the complaint seeking to set aside Carmine’s mortgage, Frank counterclaims on the ground the action is brought “to harass and maliciously injure this defendant.” A malicious prosecution action is not available in such circumstances where no actual interference with person or property is shown. (PJI 3:50; 2 NY PJI 811.) In any event, no malice has been here shown. Consequently, the counterclaim is dismissed.
*679 CONCLUSION
In conclusion, the court finds Anna’s mortgage good only to the extent of $187.19 and orders her to file a satisfaction for the difference between that sum and the amount of her mortgage which shall then be recorded by the county clerk. (Real Property Law, § 321, subd 2, par [b]; RPAPL 1501, subd 5; 1921.) The court dismisses the complaint with respect to Carmine and the counterclaim asserted therein. Kathleen is awarded one bill of costs in her action against Frank and Anna, and Carmine is awarded costs in the action against him.

. In an order dated Jan. 17,1980, Frank’s arrears as of Nov. 16, 1979 were fixed at $2,422. From Nov. 16 to Jan. 9, 1980, a period of approximately seven weeks, an *671 additional $938 in arrears were incurred using the figure of $134 per week support retroactively ordered by Justice Di Paola in Nov., 1980.

. Although the mortgage refers to a note, bond or obligation of same date, in fact no other instrument was ever executed by Frank in connection with the mortgage.

. As of Oct. 25,1980, Frank owed $5,494 in addition to the arrears of $3,360 owed as of Jan. 9 (41 weeks at $134 per week). This made a total of $8,854 owed to Kathleen. In addition, on Feb. 15, 1980 an order had been entered awarding Kathleen $3,918 in attorney’s fees and disbursements. Thus, if Carmine had inquired, he would have found that $12,772 was owed by Frank to Kathleen as of Oct. 25, 1980.

. Since the mortgages only operated as security for the underlying debt and since the court always had power to cancel or reduce the mortgages to the extent the underlying debt had been paid (cf. RPAPL 1501, subd 5; 1921), the court must consider the underlying debts rather than the face amount of the mortgages in determining whether Frank was rendered insolvent.

. Since the mortgage was, at least to the extent of $3,689, for good consideration when made, the presumption of insolvency arising from transfers without consideration is not here applicable. (See, generally, 24 NY Jur, Fraudulent Conveyances, § 29, p 432.)